REBECCA ISRAEL (N.Y. Bar No. 4783304)
(*pro hac vice application pending*)
Email: IsraelR@sec.gov
KATHLEEN SHIELDS (Mass. Bar No. 637438)
(*pro hac vice application pending*)
Email: ShieldsKa@sec.gov
Securities and Exchange Commission
33 Arch Street, 24th Floor
Boston, MA 02110
(617) 573-4582 (Israel Direct)
(617) 573-8904 (Shields Direct)
Facsimile: (617) 573-4590

Local Counsel
AMY J. LONGO (Cal. Bar No. 198304)
Email: LongoA@sec.gov
Securities and Exchange Commission
444 S. Flower Street, Suite 900
Los Angeles, CA 90071
(323) 965-3835 (Longo Direct)
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　　Plaintiff,<br><br>　vs.<br><br>JILLIAN SIDOTI,<br><br>　　　　　　Defendant. | Case No.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.      Defendant has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a). because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because at all relevant times, Defendant Sidoti maintained a law office in this district and also resides in this district.

## SUMMARY

4.      This is a securities fraud enforcement action. Sidoti, a licensed attorney, engaged in fraud in the course of shepherding a public shell company from inception to public trading. That company was Blake Insomnia Therapeutics, Inc. ("Blake" or "the Company"). Sidoti provided legal advice and services related to Blake from the time of its inception in 2012 until approximately the middle of 2017.

5.      In 2012, Sidoti helped to set up the Blake shell by drafting, signing, and submitting to the Commission legal documents that contained materially false information, and she did so despite knowing that the information was false. Specifically, Sidoti knew that the founders of Blake had no intention of pursuing the Company's stated business plan, and she knew that the purported investors named in the documents she filed had not actually invested any money; as Blake's founders

told Sidoti, they reimbursed those purported investors for their "purchases" of shares.

6.     In 2013 and 2014, Sidoti arranged to sell the fraudulently constituted Company and almost all of its shares to one or more individuals, who then collectively controlled Blake (the "Control Group"). Sidoti helped the Control Group conceal its collective control of Blake by dividing the Blake shares it purchased among a network of foreign nominee entities that were controlled by the Control Group.

7.     In 2014 and 2015, Sidoti prepared legal opinion letters that: (1) falsely described the initial registration of Blake stock and (2) included materially misleading statements about the control of the Blake shares. This was an essential step in positioning the Control Group to illegally dump its shares by selling them into the market.

8.     Sidoti's false and materially misleading opinion letters enabled the Control Group illegally to sell its shares by evading federal securities laws that: (1) require such shares to be issued pursuant to a valid registration statement; (2) require disclosure of truthful information about ownership and control of companies that sell stock to the public; and (3) restrict the amounts of stock that may be sold by company affiliates such as the Control Group. By concealing the Control Group's illegal sales of stock -- as affiliates -- Sidoti enabled the Control Group to disguise its sales of stock as ordinary trading by ordinary investors. In reality, those sales were a liquidation of shares by the Control Group.

9.     In 2017, as the Control Group illegally sold shares of Blake into the market during a promotional campaign, Sidoti continued to represent the Company and responded to inquiries regarding the ownership of its shares being sold to the public.

10.     Sidoti's conduct enabled the Control Group illegally to sell approximately 7.2 million shares of Blake to the public.

11.     As a result of the conduct alleged herein, Sidoti violated, and unless

COMPLAINT

restrained and enjoined will continue to violate, Sections 5(a), 5(c), 17(a)(1), and 17(a)(3) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

12.     The Commission seeks a permanent injunction against Sidoti, enjoining her from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint; civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; an order barring Sidoti from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and/or Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)]; a permanent injunction restraining Sidoti from providing legal services in connection with the offer or sale of certain securities; and such other relief as the Court may deem appropriate.

## DEFENDANT

13.     Jillian Sidoti, age 42, resides in Winchester, California. Sidoti is a partner at the law firm of Trowbridge & Sidoti LLP (also known as "Crowdfundinglawyers.net"), which is based in Murrieta, California.

## RELATED ENTITY

14.     Blake Insomnia Therapeutics, Inc. ("Blake") is a Nevada corporation that purportedly has a principal place of business in New York, New York. Blake was originally incorporated in Nevada in August 2012 as Book It Local Inc. Blake changed its name to BioHemp International, Inc. in June 2019. The Commission suspended trading in Blake stock (Ticker: BKIT) for 10 days effective July 26, 2019.

## THE ALLEGATIONS

**A.     Background and Terminology**

15.     Persons who control companies which have stock that is sold to the public are subject to a variety of legal and regulatory requirements. Such persons are called "affiliates" and the public companies are called "issuers." An "affiliate" of an issuer is a person or entity that, directly or indirectly through one or more

intermediaries, controls, is controlled by, or is under common control with, such issuer. "Control" means the power to direct management and policies of the company in question. Affiliates include officers, directors and controlling shareholders, as well as any person who is under "common control" with, or has common control of, an issuer. As used herein, the term "Control Group" means a group that collectively is an "affiliate" of an issuer.

16.    Before selling stock, affiliates are required to: (1) register the stock with the Commission pursuant to Section 5 of the Securities Act [15 U.S.C. §77e]; (2) sell the stock pursuant to an applicable exemption from registration; or (3) sell the stock pursuant to the conditions set forth in SEC Rule 144 [17 C.F.R. §240.144], which include limitations on the amount of stock an affiliate can legally sell.

17.    Investors in certain public companies that, like Blake, have equity securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §781], are required publicly to disclose any ownership interest in excess of 5% of the company's publicly traded stock. Such registration requirements, sale restrictions, and disclosure obligations are critical safeguards designed to inform investors about the nature of the stock they are holding or considering buying, and from whom they would be buying that stock.

18.    "Restricted stock" includes stock of a company whose shares are publicly traded (also known as an "issuer") that has been acquired from an issuer, or an affiliate of the issuer, in a private transaction that is not registered with the Commission. In addition, stock held by an issuer or affiliate of an issuer is restricted stock. Absent an exemption under the federal securities laws and rules, restricted stock cannot legally be offered or sold to the public unless a securities registration statement has been filed with the Commission (for an offer) or is in effect (for a sale). A registration statement contains important information about an issuer's business operations, financial condition, results of operation, risk factors, and management. A registration statement is also required to disclose any person or group who is the

beneficial owner of more than 5% of the company's securities.

19.    "Unrestricted stock" is stock that may legally be offered and sold in the public securities marketplace by a non-affiliate, ordinarily having previously been subject to a registration statement. Registration statements are transaction specific, however, and apply to each separate offer and sale as detailed in the registration statement. Registration, therefore, does not attach to the security itself, and registration at one stage for one party does not necessarily suffice to register subsequent offers and sales by the same or different parties. Thus, when an affiliate buys publicly-traded or otherwise unrestricted shares in a company s/he controls, those shares automatically become subject to the legal restrictions on sales by an affiliate, which strictly limit the quantity of shares that may be sold in the public markets absent registration. Without registration, affiliates are prohibited from selling large quantities of an issuer's shares, regardless of how the affiliates obtained those shares.

20.    The term "float," as used herein, refers to an issuer's purportedly unrestricted stock that is available for trading. Sidoti and the Control Group's representatives sometimes referred to Blake's purportedly unrestricted shares or float as "free-trading" shares.

21.    A "transfer agent" is a company which, among other things, issues and cancels certificates of a company's stock to reflect changes in ownership. Many companies that have publicly traded securities use transfer agents to keep track of the individuals and entities that own their stock. Transfer agents routinely keep track of whether shares are restricted from resale.

22.    The Depository Trust Corporation ("DTC") is a central securities depository that serves as a custodian of securities. DTC performs the electronic exchange for securities on behalf of buyers and sellers and settles the vast majority of securities transactions in the United States. If an issuer's securities are deemed "DTC eligible," DTC will hold an inventory of eligible shares on deposit. DTC defines an

COMPLAINT

eligible security as "one that is freely tradeable pursuant to U.S. securities laws and is otherwise qualified to be held at DTC and serviced."

23.     A "shell company" is a legal entity that lacks meaningful assets or business operations. In a scheme to profit from such companies without actually commencing business operations, individuals sometimes file materially false registration statements and other filings to make company shares appear to be eligible for public trading and quotation. Such "clean" shells, as they are called, may be sold for substantial sums.

**B.     Sidoti Schemed to Set Up Several Sham Shell Companies with Two Other Individuals**

24.     In June 2012, Sidoti had a phone call with Individuals A and B. Individual A was a longtime client of Sidoti's and Individual B was Individual A's business partner. They discussed a scheme involving the creation and sale of six shell companies. One of those shell companies became Blake.

25.     Individuals A and B told Sidoti that: (1) they intended to start two shell companies per week for the next three weeks; (2) they had not yet decided what they were going to name the six companies; (3) they did not yet have ideas for the purported business purposes for at least four of the six proposed companies; and (4) they had not yet decided whom they would appoint as the purported officers for any of the companies.

26.     On the same phone call, Individuals A and B explained to Sidoti that, in sum and in substance, none of the companies' shareholders would be bona fide investors, but that they intended to structure each company to look like it had 35 unaffiliated shareholders who had actually invested their own money. To create this appearance of multiple, independent investors, Individuals A and B intended to ask friends and acquaintances to sign investment paperwork, while Individuals A and B would give the purported investors the money to pay for their purported investments. Specifically, Individual A told Sidoti that he would ask each of the purported

COMPLAINT

investors to write a check to purchase shares in the company, and that he would give them each approximately $300 in cash as reimbursement. Individual A told Sidoti that he already had an account containing $65,000 that would fund the $10,800 in purported investments for each of the six companies, and that they would soon provide her with the shareholder names to list in the registration statements Sidoti had agreed to prepare for each company.

27.    As discussed on the phone call, Individuals A and B planned to ask acquaintances to pose as officers of each company in Commission filings, which require the names of a company's officers to be listed. Sidoti thus knew that Individuals A and B would not appear, on paper, to have control over the companies, but that Individuals A and B planned to, and did, exercise actual control over the companies, including Blake.

28.    Individuals A and B made clear to Sidoti that the purpose of creating the companies was to create clean shell companies and to sell them to shell buyers. Thus, Sidoti knew that Individuals A and B (along with the purported officers they would recruit) had no intention of setting up actual operations for any of the six companies and had no intention to pursue the stated business for the companies. Consistent with this understanding, Sidoti discussed potential sales of these shells with Individuals A and B and advised them about variables that would make their shells more "marketable." In particular, Sidoti offered guidance about the number of shares to be issued, and about arranging to keep a shell's shares under common control so that all of the shares could be transferred to a buyer – which Sidoti described as a "fully deliverable" shell. During the same period, Sidoti had received emails about the prices at which both shell and non-shell public companies had been sold to people who wanted to gain access to the public securities markets. Sidoti told Individuals A and B that she had recently seen offers for shell companies of $300,000 or more.

29.    Sidoti and Individuals A and B discussed how Sidoti would profit from her participation in the scheme. They agreed that she would be paid for her services

in setting up the shells, that she would be paid additionally for acting as the broker in the anticipated sale of the shells, and that she would also receive shares of stock in the shell companies so she could profit when the shells were sold to buyers.

**30.**    Sidoti and Individuals A and B created six companies, including Blake, according to the plan described above.

**C.    Sidoti Executed the Scheme as to Blake**

31.    On August 11, 2012, Sidoti signed Articles of Incorporation to incorporate Blake in Nevada. Blake was originally incorporated under the name Book It Local, with a stock ticker "BKIT."

32.    In or about August 2012, Individual A recruited a friend to serve as a figurehead CEO of Blake ("Figurehead CEO"). Individual A told Figurehead CEO that he would have no actual responsibilities in regards to the Company. He explained that Figurehead CEO's name would simply be listed on forms, that Figurehead CEO would have to sign some documents, and, once he was no longer needed, Figurehead CEO would be instructed by Individual A to resign from his officer position. Figurehead CEO signed Blake's Form S-1 and documents relating to the issuance of Blake shares.

33.    In August 2012, Sidoti drafted a private placement memorandum ("PPM") for Blake. A PPM is a legal document typically provided to prospective investors when selling securities in a business. A PPM commonly describes the company selling the securities, the terms of the offering, and the risks of the investment. The Blake PPM contained numerous statements that Sidoti knew were false and materially misleading. For example, the PPM falsely stated that Figurehead CEO had provided the business plan for Blake; that Figurehead CEO was working with Sidoti to prepare an SEC registration statement; and that Figurehead CEO would coordinate all business operations for Blake.

34.    In actuality, Sidoti knew that Figurehead CEO did none of these things. She knew that Individuals A and B were running and controlling Blake. Though

neither Individual A nor B appeared, at least on paper, to have control over Blake, when Sidoti sought Blake's authorization to act, she routinely reached out to Individuals A and B rather than to Figurehead CEO.

35.     The PPM that Sidoti drafted described Blake as a "development stage company" that intended to create an "online booking system" to help consumers find and hire live entertainment for events. Sidoti falsely stated in the PPM that Blake had already developed an online bidding system for entertainment booking and that the Company would work to build up a database of musicians for events. In actuality, based on her discussions with Individuals A and B, Sidoti had no reason to believe that anyone had begun executing any such business plans, nor did she have reason to believe that anyone intended to do so. Rather, as Sidoti had been told explicitly by Individuals A and B, they created Blake, along with the other shell companies, for the purpose of marketing it to a shell-buyer.

36.     In or about August 2012, Individual A recruited 35 friends and acquaintances to act as shareholders of Blake (the "Purported Shareholders"). Each of the Purported Shareholders wrote checks in the amount of $285, an amount slightly below the $300 figure that Individual A had previously mentioned to Sidoti. These checks provided written evidence of the Purported Shareholders' "investments" in Blake. In turn, each of the Purported Shareholders was listed as receiving 28,500 shares of the company. Simultaneously, Individual A repaid each Purported Shareholder a roughly equal sum in cash, as he had explained to Sidoti. This resulted in Blake issuing, on paper, 997,500 shares to the 35 Purported Shareholders.

37.     Also in August 2012, Blake issued approximately 9.6 million shares to four other shareholders (the "Original Blake Affiliates"). Two of these shareholders were companies owned or controlled by Individual A; each received about 4.5 million shares. The third of these shareholders was Blake's Figurehead CEO, who received approximately 211,000 shares. The fourth of these shareholders was Winchester Investments, an entity controlled by Sidoti, which received approximately

1  380,000 shares.

2      38.    Though Sidoti controlled Winchester Investments, she named her

3  paralegal as the owner of record on the Winchester Investment incorporation

4  documents and account opening documents. The paralegal acted at Sidoti's direction

5  with respect to all actions regarding Winchester Investments.

6  **D.    Sidoti Drafted and Filed a Fraudulent Form S-1 Registration Statement**

7      **for Blake**

8      39.    On September 19, 2012, Sidoti, on behalf of Blake, filed with the SEC a

9  Form S-1 registration statement for the approximately 10.6 million shares of Blake

10  that were purportedly distributed in August 2012. Sidoti drafted Blake's Form S-1

11  registration statement, and she was paid $5,000 for her services relating to the Form

12  S-1. Collectively, the approximately 10.6 million shares subject to Blake's September

13  2012 registration statement are referred to herein as the "S-1 Shares."

14      40.    A Form S-1, also known as a "registration statement," is the initial

15  registration form required by the SEC for new securities. Registration statements are

16  an important source of information about a company for prospective investors. Form

17  S-1 requires companies to detail their current business model and planned use of

18  capital proceeds, and also requires disclosure of any material business dealings

19  between the company and its directors or outside counsel. Prospective investors often

20  rely on the information a company supplies in its Form S-1 to determine whether they

21  should invest in a stock. An issuer is liable for any material misrepresentations or

22  omissions in a Form S-1, as are professionals who prepare or certify any part of the

23  Form S-1, or who prepare or certify reports used in connection with the Form S-1.

24      41.    Sidoti also signed a legal opinion letter, which she filed with Blake's

25  Form S-1, representing that the shares of Blake were "validly issued, fully paid, and

26  non-assessable." Sidoti knew, or recklessly disregarded, that at least some of the S-1

27  shares were not "validly issued" or "fully paid." On the contrary, as Sidoti knew, the

28  Purported Shareholders listed as purchasers in the Form S-1 were not bona fide

COMPLAINT

investors.

42.     Sidoti also repeated in the Form S-1 several of the misstatements in the PPM regarding the purpose of Blake and the involvement of Figurehead CEO and his intentions to create an online entertainment booking system. Sidoti also provided materially misleading information regarding her own interest in Blake. Specifically, she falsely asserted in the Form S-1 that she had no "direct or indirect" interest in Blake, even though she actually owned approximately 380,000 Blake shares through Winchester Investments.

43.     Blake's S-1 registration statement was deemed effective by the Commission on June 10, 2013. When a registration statement is deemed effective, a company may legally sell the registered shares to the public.

**E.     Sidoti Brokered the Sale of the Blake Shell to a Control Group**

44.     In the fall of 2013, soon after completing the Form S-1 registration process, Sidoti was directly involved in marketing and selling the Blake shell to a buyer. Beginning at least by October of 2013, Sidoti began advertising the shell for sale. Sidoti told potential buyers that she was looking to sell Blake for "$212,500 net to the seller," and that the shell was "100% deliverable" – meaning that the buyer could purchase all of the company's shares, including the ones nominally held by independent shareholders.

45.     In or about December 2013 and January 2014, Sidoti successfully brokered the sale of all of the shares of Blake to one or more individuals acting in concert (referred to herein as the "Control Group").

46.     Sidoti and representatives of the Control Group negotiated and agreed on a purchase price of $275,000 for the Blake shell. On or about December 16, 2013, Sidoti—who also acted as escrow agent for the transaction—received a single wire transfer for approximately $275,000. The $275,000 represented the purchase price for two separate stock purchase agreements drafted by Sidoti – one for $250,000 and one for $25,000 – by which the Control Group acquired almost all of the original S-1

COMPLAINT

shares of Blake – roughly 10.6 million shares. As the drafter of the agreements and the broker of the sale, Sidoti knew, or recklessly disregarded, that the buyer of those shares became an affiliate of Blake through the transaction, because it acquired well over 10% of Blake's issued and outstanding stock. Sidoti also knew, or recklessly disregarded, that the Control Group's shares legally constituted "restricted stock," based on, among other provisions of the securities laws, the restrictions on sales by affiliates.

47.    Before formally transferring any shares, Sidoti took a series of steps designed to conceal the fact that a Control Group had purchased virtually all the shares of Blake. She helped to orchestrate a new issuance of shares of Blake, to increase the number of outstanding shares, and she helped to structure the Blake transaction as multiple separate sales, splitting up the S-1 shares purchased by the Control Group into smaller blocks of shares to be transferred among eight nominee entities set up by the Control Group.

48.    The goal of these steps was to ensure that the Control Group would eventually be able to sell their Blake shares into the market as if they were unrestricted shares. To accomplish this, the Control Group had to conceal the fact that it, and the members of the group, were affiliates of Blake. Otherwise, transfer agents and other market gatekeepers would be expected to limit or reject the Control Group's future attempts to sell significant amounts of stock into the marketplace.

49.    Sidoti knew that selling stock into the public markets was the goal of these machinations. Specifically, in December 2013, she wrote an email to the Control Group's representative explaining that the shares would have to be split up into smaller blocks of shares in order for the transaction to "result in fully free tradable stock." She explained, "[y]ou would have to make sure it gets divided up amongst many shareholders (so no one is holding more than 10% of the outstanding stock)." In another email forwarded to Sidoti, a Control Group representative wrote, regarding the issuance of the 21 million new shares, "the reason to do it in this order

COMPLAINT

is to increase the I&O [issued and outstanding shares] prior to the assignment to keep all the new shareholders below 5% and therefore ensuring all shares that are assigned to the new holders remain free trading."

50.     Sidoti helped to orchestrate the steps described above. In or about January of 2014, Blake issued 21 million new restricted shares. As noted, the purpose of this issuance was to dilute the percentage of shares transferred to the Control Group's eight nominee entities. Sidoti was involved in preparing paperwork for the issuance, communicating to Blake's transfer agent about the issuance, and arranging for Figurehead CEO to sign the documents for the new issuance.

51.     This issuance of new restricted shares diluted the 10.6 million original S-1 shares to 33.5% (as opposed to 99.9%) of the total issued and outstanding shares of Blake. Then, as a second step, described below, those 10.6 million shares were further split among the Control Group's eight nominee entities so that each entity would nominally hold less than 5% of the total issued and outstanding stock.

52.     Consistent with Sidoti's email noting that the shares should be divided up among multiple shareholders, Sidoti drafted two stock purchase agreements that called for the 10.6 million S-1 shares to be split between, and transferred to, the Control Group's eight offshore entities in roughly equal blocks (each equal to less than 5% of the outstanding stock of Blake). By assisting with the new issuance that diluted the stock, and by arranging to transfer the shares in a way that would create the appearance that there were multiple independent purchasers, Sidoti fraudulently concealed the Control Group's affiliate status.

53.     The two stock purchase agreements that Sidoti drafted provided that the shares would be transferred and split up among the eight offshore nominees as follows:

        i.     Shares held in the names of the 35 Purported Shareholders (totaling 997,500 shares) listed on the Form S-1 were transferred to one offshore nominee entity controlled by the Control Group. These shares did not bear restrictive

legends (identifying the shares as restricted from resale) because the 35 Purported Shareholders' shares were purportedly registered for sale as part of the 2012 Form S-1, and the Purported Shareholders appeared, on paper, not to be insiders or affiliates.

   ii. Shares held in the names of the Original Blake Affiliates (approximately 9.6 million shares) were transferred to seven other offshore nominee companies controlled by the Control Group in blocks of just under 1.4 million shares each. These shares bore restrictive legends.

54. Sidoti instructed Blake's transfer agent to send all of the share certificates in the names of the eight nominee entities to a single address.

55. Sidoti also arranged to sell nearly all the Blake shares she held in the name of Winchester Investments to one of the foreign nominee entities for $60,000. Sidoti used those proceeds for personal purposes.

56. In January of 2014, Blake announced in a public filing a change of control and business purpose, including the installation of a new CEO. Sidoti agreed to be counsel for Blake going forward.

**F.** **Sidoti Positioned the Control Group to Sell Blake's Shares to the Public by Writing and Signing Materially Misleading Legal Opinion Letters**

57. Once the Control Group had acquired Blake's shares and held them in the name of its eight nominee entities, Sidoti played a key role in getting the shares ready for public sale. Sidoti authored and signed opinion letters that she knew, or was reckless in not knowing, contained material misstatements. She sent these opinion letters to a transfer agent and to a securities settlement provider, to induce them to make Blake's shares available for sale in the securities markets.

**Transfer Agent Letters**

58. On or about December 5, 2014, Sidoti drafted and sent at least two opinion letters to Blake's transfer agent. One letter opined on the stock purchase agreement that conveyed the shares held by the 35 Purported Shareholders listed on Blake's Form S-1 registration statement to one of the Control Group's foreign

1  nominee entities. Another letter opined on the stock purchase agreement that
2  conveyed approximately 9.6 million shares, from the Original Blake Affiliates,
3  including Sidoti's Winchester Investments. These shares had been conveyed to the
4  seven additional foreign nominees for the Control Group, with each nominee entity
5  receiving approximately 1.3 to 1.39 million shares.

6       59.    In both letters, Sidoti falsely represented that "the Shares were registered
7  on an S-1 Registration Statement," that they were validly issued, that they "will no
8  longer be restricted as affiliate shares," and "may be issued free of restrictive legend."
9  She concluded each letter by stating "I am of the opinion that the Shares are free-
10 trading and may [be] transferred free of a restrictive legend."

11      60.    In writing the December 5, 2014 opinion letters, Sidoti intended to
12 induce the transfer agent to remove the restrictive legends that would otherwise limit
13 the sales of stock by the Control Group.

14      61.    At the time she signed the Opinion Letters, Sidoti knew, or was reckless
15 in not knowing, that (1) the Form S-1 registration statement, on which she purported
16 to rely, contained several material misstatements, and (2) the Control Group's eight
17 nominee entities collectively owned well over 10% of Blake's issued and outstanding
18 shares and owned almost 99% of Blake's float – and therefore were affiliates of
19 Blake.

20                              **DTC Letter**

21      62.    To further position the Control Group to dump Blake shares, Sidoti
22 signed and sent to DTC a November 17, 2015 opinion letter regarding Blake. Sidoti
23 provided the letter to DTC to support a determination by DTC that the Blake shares
24 were "eligible for DTC book-entry delivery, settlement and depository services."
25 Depositing shares at DTC is the primary route through which sellers of securities can
26 trade with retail investors, and this was critical to enable the Control Group to sell its
27 shares of Blake to the public.

28      63.    Sidoti stated in her DTC opinion letter:

COMPLAINT

> We have acted as securities counsel to Blake Insomnia Therapeutics, Inc….in connection with the deposit at [DTC] of up to 10,597,572 shares of Common Stock….We are providing this opinion at the request of the Company to support a determination by DTC that the Subject Securities are eligible for DTC book-entry delivery, settlement and depository services as of the date hereof….
>
> The Subject Securities were originally issued and sold under an effective S-1 registration statement filed on September 19, 2012 …
>
> Based on the foregoing, we are of the opinion that: (a) the Subject Securities are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) the Subject Securities are freely transferable without registration under the Securities Act by a holder which is not an "affiliate" of the Company as defined in Rule 144(a)(1) under the Securities Act and has not been an "affiliate" within 90 days of such transfer.

64.     At the time she signed and submitted this opinion letter to DTC, Sidoti, knew, or recklessly disregarded, that her letter contained false statements and/or was materially misleading.

65.     Sidoti's representations regarding Blake's Form S-1 were materially misleading in that she knew the 35 Purported Shareholders listed in the Form S-1 were not bona fide investors and had not spent their own money to invest.

66.     Sidoti's representation that the subject securities "are not 'restricted securities,'" was materially misleading in that she knew, or recklessly disregarded, that these shares were legally restricted from resale because the shares were owned by affiliates of Blake – namely, the Control Group, who owned collectively approximately 33% of Blake's issued and outstanding stock and approximately 99% of Blake's float.

67.     Sidoti had arranged for the Control Group's purchase of the Blake shell and all of its stock in 2014, and had helped the Control Group split up its shares

among eight nominee entities.  Thus she knew, or recklessly disregarded, that those shares were held by affiliates who were acting as a group for the purpose of acquiring, holding, or disposing of Blake stock. Accordingly, the Control Group was prohibited from selling any of that stock—as no registration statement for such sales was in effect—unless it complied with the resale conditions of Securities Act Rule 144, which strictly limits the quantity of shares that any affiliate may sell.

68.   Sidoti signed the materially misleading November 2015 opinion letter to DTC in order to assist the Control Group in depositing its shares for public sale, knowing or recklessly disregarding that she was assisting the Control Group in evading the legal restrictions on public sales of shares owned by corporate affiliates. As a result of Sidoti's actions, the Control Group successfully deposited its Blake shares for sale in the securities markets.

**G.   The Control Group Sold Blake's Stock**

69.   In 2016 and 2017, the Control Group indirectly paid for a promotional campaign that was designed to increase the price and trading volume of Blake's stock. From January 9, 2017, through May of 2017, the Control Group sold over 5.2 million shares of Blake stock in the public market, without a valid registration statement, and without complying with Rule 144 or any other exemption. Ultimately from all of its fraudulent Blake sales, the Control Group generated proceeds of at least $7.2 million.

70.   On January 26, 2017, Sidoti responded to a letter from OTC Markets Group, Inc., which had inquired about the promotional activities concerning Blake. Over-the-Counter ("OTC") Markets, Inc. is a stock quotation service that facilitates public trading of shares in public companies that are not otherwise listed on national securities exchanges (like NASDAQ or the New York Stock Exchange). Blake was traded on the OTC Markets subsidiary known as OTC Link. In the letter, Sidoti told OTC Markets that Blake was not aware of any trading activity or promotional activity and that Blake only had two insiders, neither of whom had any intention of selling

COMPLAINT

their shares in the near future.

71.    Shortly thereafter, Sidoti filed with the SEC a Form 8-K on Blake's behalf, listing Sidoti as counsel, stating that "neither the Company, nor its directors, officers, or controlling shareholders, directly or indirectly, have been involved in any way with the creation or distribution of these promotional materials related to [Blake] or its securities," and "no directors, officers, or controlling shareholders, directly or indirectly, have been involved in any way with the creation or distribution of these promotional materials related to [Blake] or its securities" and "no directors, officers, or control persons have sold or purchased [Blake] or its securities within the past 90 days."  In reality, control persons of Blake, (i.e., the Control Group), were paying for the Blake promotion and illegally dumping their shares.

## FIRST CLAIM FOR RELIEF

### Fraud in the Connection with the Purchase and Sale of Securities
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (against Defendant Sidoti)

72.    The SEC realleges and incorporates by reference paragraphs 1 through 71 above.

73.    During the Relevant Period, shares of Blake were securities under Section 3(a)(1) of the Exchange Act, 15 U.S.C. § 78c(a)(10).

74.    By engaging in the conduct described above, Defendant Sidoti, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

75.     By engaging in the conduct described above, Defendant Sidoti violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b) & 240.10b-5(c).

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a) of the Securities Act

### (against Defendant Sidoti)

76.     The SEC realleges and incorporates by reference paragraphs 1 through 71 above.

77.     During the Relevant Period, shares of Blake were securities under Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1).

78.     By engaging in the conduct described above, Defendant Sidoti, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:  (a) employed devices, schemes, or artifices to defraud; and (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

79.     Defendant Sidoti, with scienter, employed devices, schemes and artifices to defraud; and with scienter or negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

80.     By engaging in the conduct described above, Defendant Sidoti violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & 77q(a)(3).

///
///
///

COMPLAINT

## THIRD CLAIM FOR RELIEF

**Unregistered Offer and Sale of Securities**

**Violations of Sections 5(a) and 5(c) of the Securities Act**

**(against Defendant Sidoti)**

81.    The SEC realleges and incorporates by reference paragraphs 1 through 71 above.

82.    During the Relevant Period, shares of Blake were securities under Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1).

83.    By engaging in the conduct described above, Defendant Sidoti, directly or indirectly, singly and in concert with others, has made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

84.    By engaging in the conduct described above, Defendant Sidoti has violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c), 15 U.S.C. §§ 77e(a) & 77e(c).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendant committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Sidoti and her agents, servants, employees and attorneys, and those persons in active concert or participation with any of them,

COMPLAINT

who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Sidoti and her agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

### IV.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Sidoti from directly or indirectly providing professional legal services to any person or entity in connection with the offer or sale of securities pursuant to, or claiming, an exemption under Section 4(a)(1) of the Securities Act, predicated on Securities Act Rule 144, or any other exemption from the registration provisions of the Securities Act, including, without limitation, participation in the preparation or issuance of any opinion letter relating to such offering or sale.

### V.

Enter an order barring Sidoti from participating in the offer or sale of a penny stock, as that term is defined in Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6).

### VI.

Order Defendant to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

COMPLAINT

## VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VIII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  October 19, 2020

*/s/ Amy J. Longo*

AMY J. LONGO (Cal. Bar No. 198304)
Local Counsel
longoa@sec.gov
Securities and Exchange Commission
444 S. Flower Street, Suite 900
Los Angeles, CA 90071
Telephone: (323) 965-3835
Facsimile: (213) 443-1904

REBECCA ISRAEL (N.Y. Bar No. 4783304)
(*pro hac vice application pending*)
Email: IsraelR@sec.gov
KATHLEEN SHIELDS (Mass. Bar No. 637438)
(*pro hac vice application pending*)
Email: ShieldsKa@sec.gov
Securities and Exchange Commission
33 Arch Street
Boston, MA 02110
(617) 573-4582 (Israel Direct)
(617) 573-8904 (Shields Direct)
Facsimile: (617) 573-4590

Attorneys for Plaintiff
Securities and Exchange Commission

COMPLAINT